**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

AMERISURE MUTUAL INSURANCE
COMPANY, etc., et al.,

        Plaintiffs,

vs.                                           Case No. 3:08-cv-645-J-32HTS

AUCHTER COMPANY, etc., et al.,

        Defendants.

## **ORDER**[1]

This insurance coverage dispute is before the Court on cross-motions for summary judgment (Docs. 34, 42). The parties filed responses, exhibits and further supplemental briefing (Docs. 35, 36, 41, 43, 44, 48, 53, 54, 58), and the Court heard oral argument on the motions, the record of which is incorporated by reference (see Minutes, Doc. 59).

**I. Undisputed Background Facts**

On April 17, 1997, the Auchter Company ("Auchter"), a general contractor, entered into a $26,572,363.49 standard form construction contract with the Amelia Island Company ("Amelia") for the construction of various buildings including an inn and conference center on property owned by Amelia in Nassau County, Florida. As part of the contract, Amelia paid Auchter for some of the building materials, including concrete roof tiles, that were delivered to the project site before they were used on the project. Auchter's contract price included

---

[1]Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

the cost of these materials and Auchter delivered, stored, and insured those materials until they were incorporated into the construction project.  In August 2002, after the construction project was completed, some concrete roof tiles fell from the roof of one of the Auchter-constructed buildings and Amelia contacted Auchter to make repairs.  Problems with loose or falling roof tiles continued and were exacerbated by a series of powerful storms in 2004.  Amelia and Auchter were unable to agree as to the cause of the roof failure and in June 2006, pursuant to the arbitration clause in the parties' construction contract, Amelia filed a demand for arbitration claiming Auchter was liable to Amelia for over $2 million in damages for defectively installing the roof.  According to the record before the Court, Amelia never alleged that the falling roof tiles damaged any other property nor did it allege that the defective installation of the roof caused damage to any components of the building, other than the roof itself, although Amelia did allege it would suffer lost profits because the building would be unusable during the course of roof repairs and replacement.

Amerisure Mutual Insurance Company and Amerisure Insurance Company (together, "Amerisure"), which had issued successive commercial general liability ("CGL") and umbrella liability insurance policies to Auchter between May 2002 and January 2006, defended Auchter in the arbitration proceedings under a reservation of rights.  On June 25, 2008, Amerisure filed this declaratory judgment action invoking the Court's diversity jurisdiction and seeking a declaration that Amelia's claim against Auchter was not covered "property damage" within the meaning of the insurance policies Amerisure issued to Auchter and that

Amerisure, therefore, had no duty to indemnify Auchter (or to continue to defend it).[2] While this suit was pending, the arbitrator conducted a two day hearing and on March 31, 2009 he issued his decision finding that Auchter (through its subcontractor) failed to properly secure the roof tiles to the roof structure such that the roof could not withstand the wind velocities required by the applicable building code. Thus, the arbitrator found Auchter was liable to Amelia for $2,167,313.67 in damages for the defective installation of the roof in breach of the parties' construction contract. The amount of damages was supported by evidence that the entire roof system had to be replaced due to the unavailability of the same tiles as are currently on the roofs and the impossibility of replacing roof tiles on an individual basis because of the roof design. Amelia has secured an order from state court reducing the arbitration award (and other added fees) to a judgment upon which Amelia is prepared to execute. See Doc. 43, Exhibit H (arbitration award with decision and order converting award to judgment).

Amerisure has now filed a motion for summary judgment arguing that judgment should be entered in its favor as a matter of law because none of the arbitration damages due Amelia are "property damage" covered by Auchter's insurance policies with Amerisure. Amelia has filed its own motion for summary judgment arguing to the contrary.[3]

---

[2]Under Florida insurance law, potential coverage "is triggered when property damage manifests itself, not when the negligent act . . . giving rise to the damage occurs." Assur. Co. of Am. v. Lucas Waterproofing Co., Inc., 581 F.Supp.2d 1201, 1206 (S.D. Fla. 2008). Amerisure has not suggested that the roof damage (first noticed in 2002 and exacerbated in 2004) occurred outside the coverage period.

[3]Amelia has recently filed a Chapter 11 bankruptcy petition but has waived the benefits of 11 U.S.C. § 362(a) for purposes of this litigation. See Doc. 56. Auchter, the insured party,

3

## II.     Standard of Review and Applicable Principles of Law

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that establish the absence of any genuine, material factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law." Northland Cas. Co. v. HBE Corp., 160 F.Supp. 2d 1348, 1358 (M.D. Fla. 2001) (citation omitted).

The parties agree that Florida law governs the interpretation of the insurance policies at issue. Under Florida law, "[w]hen assessing an insurance dispute, the insured has the burden of proving that a claim against it is covered by the policy, and the insurer has the burden of proving an exclusion to coverage." Key Custom Homes, Inc. v. Mid-Continent Cas. Co., 450 F.Supp.2d 1311, 1316 (M.D. Fla. 2006) (citations omitted). "[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." United States Fire Ins. Co. v. J.S.U.B., Inc.,

---

has not taken an active position in this suit; rather, it is Amelia who is having to argue that its damages against Auchter are covered by the Amerisure policy. Though named as a defendant, Auchter has reportedly ceased doing business and has not retained its own counsel to represent it in this suit. (Unsure of its duty to defend, Amerisure provided independent counsel to represent Auchter in the arbitration.)

4

979 So. 2d 871, 877 (Fla. 2007). "Insurance contracts are construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage." Id. (citations omitted).

**III.     Analysis**

Amerisure contends that Amelia's claim against Auchter is not a covered claim of property damage because the damaged property was limited to the roof itself, as opposed to damage to some other property, which would be covered (barring some other policy exclusion). Amelia, on the other hand, argues that the plain language of the policy does not limit coverage to damage to "other" property as Amerisure suggests and that, even if it did, the damage to the roof tiles themselves are covered under the policy.[4]  Each of the successive CGL and umbrella liability policies at issue provide coverage to Auchter, the insured, for "those sums that the insured becomes legally obligated to pay as damages" "because of . . . 'property damage'" "to which this insurance applies." Doc. 36 (copies of policies). The policies apply to "property damage" that is "caused by an 'occurrence' that takes place in the coverage territory" and "occurs during the policy period." Id. The policies state that "'[p]roperty damage' means . . . [p]hysical injury to tangible property, including all resulting loss of use of that property." Id.

---

[4]In their briefs, the parties discussed various policy exclusions that might or might not apply; at the hearing on the motions, however, both sides agreed that the Court need only decide whether the damage to the roof is "property damage" within the meaning of the policies. Thus, the Court has not addressed the application of any policy exclusions except to the extent that they shed light on the meaning of the "property damage" coverage the policies do provide. See, e.g., United States Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007) (explaining that insurance policy provisions and exclusions should be read in pari materia).

The scope of coverage provided under this definition of "property damage" (commonly found in post-1986 standard form CGL policies) has been reviewed in two recent Florida Supreme Court decisions. First, in United States Fire Insurance Company v. J.S.U.B., Inc., 979 So. 2d 871 (Fla. 2007), the Florida Supreme Court considered whether a contractor's CGL policy would cover damage that occurred when a subcontractor's use of poor soil and improper soil compacting at the site of several home construction projects damaged other components of the completed homes including the foundations, drywall and the home interiors. While the J.S.U.B. opinion addresses the application of various policy provisions, exclusions and exceptions not relevant here, in considering the specific question of whether "property damage" occurred, the Court examined the same policy definition as is contained in the Auchter policies and noted that the "definition of 'property damage' in the CGL policies [did] not differentiate between damage to the contractor's work and damage to other property." Id. at 889. Continuing, the Court stated that "faulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the policy." Id.

However, in its J.S.U.B. opinion, the Florida Supreme Court explained the limits of this statement: "If there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage.'" Id. Explaining further, the Florida Supreme Court recounted various decisions in which other courts have recognized the distinction "between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the cost of repairing damage caused by the defective work, which is a claim for 'property damage.'" Id. (discussing West Orange Lumber Co., Inc.

v. Indiana Lumbermens Mut. Ins. Co., 898 So.2d 1147, 1148 (Fla. 5th DCA 2005), where the court held the cost of removing and replacing the wrong grade of cedar installed by a subcontractor was not property damage; Auto Owners Ins. Co. v. Tripp Constr. Inc., 737 So. 2d 600, 601 (Fla. 3d DCA 1999), where the court held that homeowners' claims against a contractor for "the actual defects in the construction of the homes, particularly relating to the roofs of the homes" were not property damage, whereas their claims for damage to other elements of the home caused by construction defects were property damage; Cincinnati Ins. Co. v. Venetian Terrazzo, Inc., 198 F. Supp. 2d 1074, 1079 n.1 (E.D. Mo. 2001), where the court held that repair and replacement of an improperly installed floor was not property damage; Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 679-80 (Tex. App. 2006), where the court held that the cost to replace defective synthetic stucco product was not property damage but the cost to repair resulting water damage caused by the defective stucco was property damage). Applying the rationale of these cases and others to the facts of J.S.U.B., the Florida Supreme Court concluded the damage caused to components of the completed homes by the improper soil work did "not involve a claim for the cost of repairing the subcontractor's defective work, but rather a claim for repairing the structural damage to the completed homes caused by the subcontractor's defective work." Id. at 890. Thus, the contractor's CGL policy afforded coverage for the claim. Id. at 891.

The following year, the Florida Supreme Court had further occasion to examine the meaning of the standard CGL policy definition of "property damage" in the case of Auto-Owners Insurance Company v. Pozzi Window Company, 984 So.2d 1241 (Fla. 2008). In Pozzi Window, a window manufacturer, as the assignee of the insured contractor, sought

coverage under the contractor's standard CGL policy for the costs to repair and replace windows which were defectively installed in a new home by a subcontractor. Id. at 1244. At the suggestion of the contractor, the homeowner had purchased Pozzi-manufactured windows directly from a window retailer for installation by a subcontractor hired by the retailer and supervised by the contractor. Id. at 1243. After moving in, the homeowner discovered that the windows leaked, causing water damage to the surrounding walls, floor and ceiling, as well as to the windows themselves. Id. at 1243-44. In the homeowner's subsequent lawsuit against Pozzi, the window retailer, the subcontractor installer, and the contractor, the homeowner alleged that the windows themselves were defective and that they were improperly installed. Id. at 1243. The contractor's insurer paid the homeowner for damage caused to his personal property by the leaky windows, but refused to pay for the repair or replacement of the windows themselves. Id. at 1245. After further litigation and an appeal, the issue came before the Florida Supreme Court on a certified question from the Eleventh Circuit Court of Appeals asking whether the claim for repair or replacement of the windows was one of property damage within the meaning of the CGL policy. Id. The Florida Supreme Court gave a two part response:

> If the windows were purchased by the [h]omeowner and were not defective before being installed, coverage would exist for the cost of repair or replacement of the windows because there is physical injury to tangible property (the windows) caused by defective installation by a subcontractor. In that instance, damage to the windows caused by the defective installation is the same as damage to other portions of the home caused by the leaking windows. However, a different result would follow if the windows were defective prior to being installed and the damage to the completed project was therefore caused by defective windows rather than faulty installation alone.

8

Id. at 1248. In arriving at this decision, the Florida Supreme Court quoted with approval an explanation from the Supreme Court of Tennessee from another case involving a subcontractor's faulty window installation:

> [A] "claim limited to faulty workmanship or materials" is one in which the sole damages are for replacement of a defective component or correction of faulty installation. . . . [The] subcontractor allegedly installed the windows defectively. <u>Without more, this alleged defect is the equivalent of the "mere inclusion of a defective component" such as the installation of a defective tire, and no "property damage" has occurred.</u>

Id. at 1249 (citing <u>Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.</u>, 216 S.W.3d 302, 310 (Tenn. 2007) (emphasis supplied by <u>Pozzi Window</u>). As the Florida Supreme Court further explained,

> In essence, the mere inclusion of a defective component, such as a defective window or the defective installation of a window, does not constitute property damage <u>unless that defective component results in physical injury to some other tangible property.</u>

<u>Pozzi Window</u>, 984 So.2d at 1248 (emphasis added). The certified question having been answered, the case returned to the Eleventh Circuit, which issued an opinion holding that "property damage" had occurred because, while the presentation of the facts to the Florida Supreme Court may have created some confusion as to whether the windows themselves were defective or just defectively installed, the insurer had waived any claim that the windows were defective. <u>Pozzi Window Co. v. Auto-Owners Ins.</u>, 294 Fed. Appx. 588, 590-91, 2008 WL 4369301, at *2 (11th Cir. Sept. 26, 2008). Thus, the Eleventh Circuit found the subcontractor's faulty installation of the windows caused covered "property damage" for the repair and replacement of the leaky windows. Id. at 589-91, 2008 WL 4369301, at *1-2.

With this guidance from the Florida Supreme Court and the cases upon which its decisions rely, we now return to the question posed by the facts of this case: Is the cost for the removal and replacement of the entire roof including the non-defective roof tiles "property damage" when the faulty installation has caused physical damage to some of the individual roof tiles, and can only be remedied by replacing the entire roof? Amelia draws logical analogies between its roof tiles and the windows the homeowner purchased in Pozzi Window. Like there, here too, Amelia purchased the product that the subcontractor then defectively installed, and there, like here, the contractor supervised the installation of the product into the completed project. Thus, Amelia argues, as in Pozzi Window, here too the Court should find property damage.

However, unlike in Pozzi Window, here there has never been an allegation that the faulty installation caused damage to some other component of the project. Only the roof is damaged here. This seems a critical difference and puts the facts of this case more into the bailiwick of those cases described by the Florida Supreme Court where the damage is limited to the faulty work alone, thus causing "no resulting 'property damage'." See Pozzi Window, 984 So. 2d at 1247 (citing J.S.U.B., 979 So. 2d at 888-89, for the proposition that "if there is no damage beyond the faulty workmanship or defective work, then there may be no resulting property damage"); see also, J.S.U.B., 979 So. 2d at 889 (discussing those cases such as Tripp, West Orange, Venetian Terrazzo and Lennar which "differentiated between a claim for the costs of repairing and replacing the actual defects in the construction, which . . . was not covered, and a claim for the costs of repairing the damage caused by construction defects 'to other elements of the subject homes,' which . . . was

10

covered"). See also, Assurance Co. of Am. v. Lucas Waterproofing Co., Inc., 581 F.Supp. 2d 1201, 1209 (S.D. Fla. 2008) (citing J.S.U.B. and Pozzi Window as support for proposition that "[a] claim for the cost of removing or repairing defective work does not constitute a claim for 'property damage'"; whereas "[a] claim for the costs of repairing damage to other elements of the subject property that was caused by the defective work is a claim for 'property damage'").

Moreover, while Amelia likens their roof tiles to the windows in Pozzi Windows, the damaged component for which Amelia seeks insurance coverage is the completed roof- - Amelia contracted with Auchter to build a roof as part of the entire construction project and the roof tiles, screws, roofing felt and the like are the raw materials used by Auchter's subcontractor to build the roof.[5] That Amelia paid for and accepted delivery of the roof tiles prior to their installation does not persuade the Court that the result should be different. Amelia's ownership of the roof tiles (and other construction materials) was provided by the construction contract as a means to avoid incurring materialman liens. The contract provided that Auchter would procure, deliver, store and insure all materials and the parties' contract price included all materials and labor for the completed project. Thus, while there may be cases where ownership of a construction element makes the element "tangible property" to which "property damage" may then occur (such as Pozzi Window or the hypotheticals discussed at the hearing in this case where a project owner's custom item is selected for installation into a project), the circumstances of Amelia's ownership of the roof

---

[5]See Doc. 43, Exhibit A to Exhibit H (arbitrator's decision describing roof construction).

tiles here do not fit that model.

Amelia argues that even if the Court is not persuaded that its ownership of the roof tiles made them "tangible property," the plain language used in the insurance contract to define property damage is enough to find coverage. As noted earlier, for there to be property damage under the insurance contract, there must be "physical injury to tangible property." See Doc. 36. A roof tile is tangible property and there is no dispute that many of the tiles sustained "physical injury." However, Amelia has not limited its claim to recovery for damages to the individual tiles that fell from the roof and broke (as far as the Court can tell, no one has determined how many tiles that would be).[6] Rather, Amelia claims that the entire roof suffered property damage because the tiles are improperly installed, even though most of the tiles which remain on the roof are not physically damaged.[7] Thus, so far, the only "physical injury to tangible property" caused by the defective installation of the roof is to some of the individual roof tiles. On these facts, even if the Court were to base its decision on the policy definition alone, Amelia's recovery would be limited to the damages to the individual tiles that are broken.

More to the point, however, Florida courts have not read this policy definition in isolation. Rather, when viewed within the context of the entire policy and considering the

---

[6] At oral argument, Amelia's counsel suggested more than 25% of the tiles have blown off the roof.

[7] It is true, of course, that the utility of these roof tiles to Amelia is limited because there are an insufficient number of them to create a new roof and, as the Arbitrator determined, additional replacement tiles are not available. Nonetheless, those roof tiles have not sustained physical damage.

12

evolution and purpose of CGL policies generally, Florida courts, including the Florida Supreme Court in Pozzi Window, have limited coverage for "property damage" to those instances where a "defective component results in physical injury to some other tangible property." Pozzi Window, 948 So. 2d at 1248 (emphasis supplied). See also Pozzi Window v. Auto-Owners, Ins., 446 F.3d 1178, 1184 (11th Cir. 2006) (noting that Florida Supreme Court precedent required Court to look beyond the language of the policies, which might otherwise have led to the conclusion that coverage exists).[8] Thus, viewing the facts of this

---

[8] In its 2006 Pozzi Window decision, the Eleventh Circuit was discussing the Florida Supreme Court's decision in LaMarche v. Shelby Mutual Insurance Co., 390 So.2d 325, 326 (Fla. 1980), which reviewed policy exclusions and held that CGL policies cover damage or injury *resulting* from defective work but do not cover the costs of repair and replacement of the defective work itself. See Pozzi Window, 446 F.3d at 1184 (discussing LaMarche). In the Florida Supreme Court's J.S.U.B. and Pozzi Window decisions (both issued after the Eleventh Circuit's 2006 Pozzi Window opinion), the Florida Supreme Court addressed whether the reach of LaMarche had extended further than intended. See J.S.U.B., 979 So.2d at 880-83 (explaining that the broad language used in LaMarche should be viewed in the context of the pre-1986 CGL policy that it reviewed and the exclusionary clauses that the Court examined); Pozzi Window, 984 So.2d at 1246-47 (noting the "broad language and reasoning" used in LaMarche). Nonetheless, notwithstanding the post-1986 CGL policy definition of property damage ("physical injury to tangible property"), the Florida Supreme Court has maintained that the physical injury must be sustained by some "other" tangible property to constitute property damage. Id. at 1248. Thus, as the Eleventh Circuit observed in its 2006 Pozzi Window decision, here too, the Court finds that while the plain language used in the parties' insurance contract might suggest coverage exists limited to the broken roof tiles, the binding Florida precedent interpreting this clause suggests otherwise.

Notably, the Court's review of decisions from various other states reveals that while there is not a consensus, Florida is not alone in holding that "property damage" simply does not occur when the only damage is to the product itself. See, e.g., DeWitt Const. Inc. v. Charter Oak Fire Ins. Co., 307 F.3d 1127, 1133-34 (9th Cir. 2002) (holding that Washington law requires "property damage" to be sustained by something separate from the defective product itself); Esicorp, Inc. v. Liberty Mut. Ins. Co., 266 F.3d 859, 863 (8th Cir. 2001) (holding that repair of a defective component is not "property damage" under Missouri law); Westfield Ins. Co. v. Sheehan Const. Co., Inc., 580 F. Supp. 2d 701, 712-13 (S.D. Ind. 2008) (determining that under Indiana law, any damage to the contractor's work product would not be "property damage"); Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d

13

case against the controlling Florida precedent, the damage to the roof is not property damage within the meaning of the insurance policy. The defective installation of the roof did not result in physical injury to anything but the roof tiles, a component part of the roof itself. As "there is no damage beyond the faulty workmanship or defective work, then there may be no resulting property damage." J.S.U.B., 979 So. 2d at 889. Thus, the damage to the roof, while costly and unfortunate, is not property damage within the meaning of Auchter's insurance policies with Amerisure and Amelia may not recover those damages from Amerisure as a third-party beneficiary to Auchter's policies.[9]

---

302, 310 (Tenn. 2007) (holding that under Tennessee law, no "property damage" claim is stated where damages are limited to replacement of defective component or correction of faulty installment). But see, Scott C. Turner, Insurance Coverage of Construction Disputes (ICCDS) § 6:34 (Nov. 2009) (suggesting a flawed public policy rationale leads courts to find an absence of property damage when claim is for insured's defective work or product).

[9]The Court rejects Amelia's suggestion that some of the policy exclusions and exceptions would be rendered meaningless by this reading of "property damage." The Court's reading of the caselaw illustrates that the multi-faceted and interdependent nature of construction projects often means that faulty workmanship to one part of a project (the roof, for example) can lead to damage to another part of the project (such as stucco walls which may leak from faulty roof construction). In such an example, under Auchter's CGL policies, the damage to the stucco walls would be "property damage" within the meaning of the policy, but would ordinarily be excluded under the "your work" exclusion, unless the stucco walls had been constructed by a subcontractor, in which case the damage could be covered by the subcontractor exception to the "your work" exclusion. In this manner, the relevant policy terms are all given effect. See, e.g., Assur. Co. of Am. v. Lucas Waterproofing Co., Inc., 581 F. Supp. 2d 1201, 1209-10 (S.D. Fla. 2008) (explaining that while repair of defective waterproofing was not property damage, repair of other parts of building affected by defective waterproofing could be property damage and subcontractor exception to "your work" exclusion would permit recovery of such claims).

Accordingly, it is hereby

**ORDERED**:

1. The Motion for Summary Judgment filed by Amerisure Mutual Insurance Company and Amerisure Insurance Company (Doc. 34) is **GRANTED** as follows:

> The Court finds that the insurance policies issued by Amerisure Mutual Insurance Company and Amerisure Insurance Company to The Auchter Company do not provide liability insurance coverage to The Auchter Company for the amounts awarded against The Auchter Company in the March 31, 2009 Arbitration Award. Amerisure Mutual Insurance Company and Amerisure Insurance Company therefore have no continuing duty to defend or to indemnify The Auchter Company as to the Arbitration Award.

2. Amelia Island Company's Motion for Summary Judgment (Doc. 42) is **DENIED**.

3. The Clerk shall enter a declaratory judgment as stated herein in favor of Amerisure Mutual Insurance Company and Amerisure Insurance Company and against The Auchter Company and Amelia Island Company; thereafter, the Clerk shall close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 4th day of February, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:
counsel of record
John Caven, Esq. (Registered Agent for Auchter Company)